## PEPPER *v.* STATE.

(In Banc. Nov. 11, 1946. Suggestion of Error Overruled Dec. 9, 1946.)

[27 So. (2d) 842. No. 36235.]

**Alfred Stoner**, of Greenwood, for appellant.

**Greek L. Rice**, Attorney General, by **R. O. Arrington**, Assistant Attorney General, for appellee.

**McGehee, J.,** delivered the opinion of the Court.

The defendant was convicted of assault and battery with intent to kill and murder, and was sentenced to serve a term of five years in the State penitentiary. On this appeal, he does not challenge the sufficiency of the evidence to amply sustain such conviction, nor does he contend that the trial court committed any error except by its refusal to grant the accused a new trial on the ground that at the close of the evidence, and during the noon recess which intervened before the case was argued and submitted, the bailiff permitted a conversation between a young man from another county and a juror who had been in the military service with him, and which conversation took place under the following circumstances:

This conversation occurred while the juror and his visiting friend were seated on the front row of the seats for spectators in the courtroom, in plain view of the other eleven jurors who were seated in the jury box and the two jury bailiffs. When the conversation began, there was no one else in the courtroom. The jury was awaiting the return of the judge and the attorneys in the case. One of the bailiffs had been requested by this visitor to permit him to converse with this juror about the G. I. Bill of Rights, 38 U. S. C. A., sec. 693 et seq. This permission was granted, and the bailiff stood nearby during a part of the four or five minute conversation in question. While there, the participants were heard by him to begin discussing this Bill of Rights, in pursuance of the permission granted them. They were instructed by the bailiff in the outset not to discuss anything else.

The bailiff testified that before the conversation ended, he left the immediate presence of the participants therein and went to a place near the back of the courtroom where some two or three persons, who were interested on behalf of the defendant, had become seated, and that the trial judge "then came in" the courtroom. Therefore, it appears that the bailiff did not hear all of the conversation now complained of.

As to the real purpose for which the visitor desired to converse with the juror the testimony of this bailiff discloses by hearsay evidence, (but which was not objected to and was therefore competent under the decision of Citizens Bank of Hattiesburg v. Miller, 194 Miss. 557, 11 So. (2d) 457, and cases therein cited), that the young man had come from Water Valley, Mississippi, during the forenoon of that day, and had come to the home of the juror, a distance of several miles from the place of the trial, to see him, and had there learned that the juror was at court in the City of Greenwood. That this young man then proceeded to Greenwood, saw the sheriff at about the time the jury was coming downstairs from the courtroom for the noon recess, asked for and was granted permission to shake hands with this juror, and was thereupon advised by the latter that the jury was to be back in the courtroom after the recess hour.

It does not appear that either the visiting young man or the juror sought to have any conversation with each other during the noon recess prior to the jury's return to the courtroom, and not then until they had obtained permission from the bailiff to discuss the matter about which the young man desired some information. Nothing occurred to indicate that they desired or held a secret or confidential conversation. The bailiff departed from where the conversation began, and of his own volition. There is no reason to infer that either of them could anticipate that the bailiff would leave them alone or that they had any desire that he should do so. Moreover,

there is no ground upon which to base a well-founded suspicion that any improper influences were used against the defendant in the conversation complained of. It does not appear that the visitor even knew the nature of the proceeding being tried, whether civil or criminal, or that he had ever before heard of either the accused or the victim of his assault, or was acquainted with any person interested either in the prosecution or defense.

Under the foregoing circumstances, the trial judge had no reason to suspect that any improper influence had been used by this young man against the accused. A mere possibility that such influence might have been used on the occasion complained of is not sufficient to justify the setting aside of this conviction. The cases of Sanders v. State, 150 Miss. 296, 116 So. 433, and Turner v. State, 176 Miss. 862, 170 So. 642, and other decisions of this Court have expressly so held. Hence, the trial judge overruled the motion for a new trial under the proof heard thereon.

In the nature of things, there must occur in the course of protracted criminal trials some irregularities, as well as errors, which are prima facie prejudicial to the constitutional right of the accused to a fair and impartial trial, and it becomes necessary during such trials for the judge to pass on certain issues of fact, aside from those for the determination of the jury which involve the guilt or innocence of the accused on the merits, and where it appears to his entire satisfaction from convincing evidence that no prejudice did result from the act in question, he should not set aside a conviction. Only the courts of West Virginia, Idaho and New Hampshire require that the trial judge shall be satisfied beyond a reasonable doubt or to the exclusion of every other reasonable hypothesis that no improper influence has been exerted against the accused.

In the Mississippi case of Hare v. State, 4 How. 187, it appears from the statement of the facts in the case

that after the issue had been submitted to the jury, a man by the name of Woodley went into the room unnoticed by the bailiff, and that notwithstanding this intrusion, the bailiff withdrew to obtain water for the jury and left them under the charge of such intruder, and it appears from the bill of exceptions that Woodley conversed with the jurors on the subject of the prisoner's guilt. In that case, Judge Sharkey said that: "Whilst the law is rigidly vigilant in guarding and preserving the purity of jury trials, yet it will not for light or trivial causes, impugn the integrity of juries, or question the solemnity and impartiality of verdicts. But if the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which under a more guarded administration, it is capable of producing. It is not necessary that any attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed; this is the only security; for if it be left open, it may be predicted with certainty, that the evil consequences will fall some where."

The substance of the foregoing quotation from Hare's case has been brought forward in some of the other earlier cases decided by this Court, such as McQuillen v. State, 8 Smedes & M. 587, and Woods v. State, 43 Miss. 364, where the jurors had mingled with the "crowd" under circumstances which not only afforded an opportunity for them to imbibe the prejudice of those in attendance upon the court; but which indicated a strong probability that they would naturally have done so, but it should be kept in mind that what had occurred in these particular cases furnished the occasion for the use of strong language to condemn an injustice done by the incident complained of. Moreover, in the later case of

Skates v. State, 64 Miss. 644, 1 So. 843, 60 Am. Rep. 70, Judge Cooper expressly stated that the language of these earlier cases must be interpreted by the circumstances of the cases in which it was used.

And, theretofore, in the case of Green v. State, 59 Miss. 501, Judge Cooper had also very aptly said that: "It is not every act of misconduct on the part of jurors which will entitle a defendant to a new trial, but where such acts are shown, if they are of such character as may have prejudiced the defendant, the presumption is that they did, and it devolves upon the State to establish the fact that such result did not follow. But where all of the facts and circumstances are known, and it appears with reasonable certainty that though there was exposure to influences which might have perverted or corrupted the judgment of the juror, it was not done, then the verdict ought to stand." But, no misconduct on the part of either the juror or the young man who talked to him appears from this record, since they acted with permission of the bailiff, and in the utmost good faith, insofar as the proof discloses, when discussing the G. I. Bill of Rights—a subject which would naturally have been inexhaustible within such a short period of four or five minutes. Nor is it at all unnatural that the young man may have thought that his friend, the juror, might be able to give him the particular information that he may have desired in regard thereto.

The requirement that jurors be kept together in felony cases is not prescribed by any statute of this State. It finds its origin in the early common-law decisions, based upon the law of England, which, in the early days, had announced the rule "that a jury, after the evidence given on the issue, ought to be kept together in some convenient place, without meat or drink fire or candle, . . . and without speech with any, unless it be the bailiff, and with him if they be agreed." Such a rule in modern practice would preclude a physician from conversing with a juror

who had become ill, for the purpose of ascertaining a history of his ailment.

Under the modern rule, as announced in 16 R. C. L. 307, et seq., to the effect that "Where there has been separation for a necessary or innocent purpose," the courts do not, as a general rule, set aside a verdict merely because there might possibly have been misconduct. And, it is also there announced that "The presumption of prejudice arising from an improper separation may generally be rebutted by an affirmative showing that the separated jurors were not so communicated with as to injure the defendant." In other words, the prosecution is not required under this rule to prove that a juror has not been communicated with, but merely that he has "not been so communicated with as to injure the defendant." And the question arises as to who is to determine whether he has been "so communicated with as to injure the defendant." The answer is that the question is for the decision of the trial judge, and his finding of fact on such issue should not be disturbed if supported by such substantial evidence as did convince him, and should convince the appellate court, that it is not reasonably probable that undue influence has been exerted. Of course, if it should be manifest on appeal that the decision of the trial judge is clearly wrong, a new trial should be ordered.

The early case of Organ v. State, 26 Miss. 78, tends to sustain the right of the appellant to a new trial, but the later case of Green v. State hereinbefore cited, and the cases of Cartwright v. State, 71 Miss. 82, 14 So. 526, and Carter v. State, 78 Miss. 348, 29 So. 148, and other later decisions, all recognize that the facts of each case are to determine whether or not there has been a mere possibility that undue influence was exerted against the accused, and this is not alone sufficient to justify the setting aside of a conviction. See also the numerous cases cited in the Annotation Note in 24 L. R. A. (N. S.)

776, holding that proof that a juror has separated from his fellows in a felony case, and had been conversed with by a third person, or where there has been an opportunity afforded for such a conversation, the presumption is that the defendant had been prejudiced thereby; and that it then becomes incumbent upon the State to rebut such presumption by affirmative proof to the satisfaction of the court that no improper influence has been used against the accused, that is to say, where it is not reasonably probable that such improper influence has been exerted, no new trial should be granted on account of such separation.

We are not unmindful that in the case of Queen v. State, 152 Miss. 723, 120 So. 838, 839, the Court said that, "If the juror should separate and should come in contact with people in such way as to make it appear that he has had opportunity to communicate with others, then the verdict would be set aside." However, this language is pure dicta; there had been no communication in that case between the juror and a third person about anything; the conviction was affirmed on the appeal here; and what was said in the opinion about what would be the result if there had been conversation with the juror was a statement not necessary to the decision of the question involved.

We are of the opinion that the action of the trial court in overruling the motion for a new trial was correct, and that the judgment appealed from should be affirmed.

Affirmed.

**L. A. Smith, Sr., J.,** delivered a dissenting opinion.

I respectfully dissent from the controlling opinion in this case, affirming the judgment of the trial court.

Sam Pepper was convicted in the Circuit Court of Leflore County of assault and battery with intent to kill and murder Tommy Lee Crosby, and sentenced to a

term of five years in the State penitentiary. From this judgment, he appeals here and assigns as the only error committed by the trial court the following: "The court erred in refusing to set aside the verdict and grant a new trial, for the reason that one of the jurors, after both sides had rested, but before the arguments were made, separated from the jury; went beyond their hearing and held a private conversation with a stranger who was not a member of the jury."

Proof was heard on the motion, and the court overruled it. It appears that the evidence in the trial was completed just at noon, and the court had recessed for lunch. As the bailiffs led the jury down the stairs in the courthouse on the way to their lunch, a strange white man from another county appeared and said he had been seeking one of the jurors at Schlater and there learned he was on the jury. He then shook hands with this juror, who told him to be back at two o'clock, that he did not know when the trial would be over. About the time appointed, when the courtroom was empty except for the jury, the bailiffs and two or three others, the stranger returned, requested from a bailiff permission to talk to the juror about the G. I. Bill of Rights, 38 U. S. C. A., sec. 693 et seq., which was granted. The evidence does not disclose why he wanted to discuss such a complicated and involved subject with the juror, or that the juror had anything to do with administering that Act of Congress. However, the stranger was a sailor. The other jurors were all in the box, and this stranger and this particular juror removed themselves beyond the hearing of the others and had a private, confidential conversation. At its beginning, one of the bailiffs near the water cooler heard one mention of the G. I. Bill of Rights, but immediately withdrew out of earshot of the conference, and knew nothing more about what was said in it. Certainly, a conversation lasting less than five minutes (and there is no proof in the evidence of the reason for its

brevity) was wholly inadequate for any effective or practical discussion of such a subject as the one he professed his desire to discuss, but, it was sufficient for the delivery of a message from the outside by the stranger as a messenger, or for him to make an improper subversive proposal to the juror. The State was unable to prove the conversation was confined to the G. I. Bill of Rights, and therefore failed to show affirmatively by evidence that no improper influence was exerted in the confidential conversation. Neither the juror nor the stranger testified. The State, misconceiving its own obligation in the premises, argues that the defendant made no showing that anything improper took place. The presumption did that for him, and it then devolved upon the State to rebut this presumption by positive affirmative evidence to the contrary, which the State failed to do. The presumption therefore still persists, according to comparatively recent decisions of this Court, which have never been overruled.

Here, we have present not only an opportunity of talking to a juror separated widely and alone from his fellow jurors, but an actual private conversation between the juror and a stranger, even the name of whom appears unknown to the witnesses testifying on the motion for a new trial. The conference of this stranger with the juror was not in the audible presence of the rest of the panel. It will be remembered that the bailiff heard just a few words of the low-voiced conversation, and then left the proximity and went elsewhere in the courtroom. Although the G. I. Bill of Rights was mentioned while he was at the water cooler, and this was the purported object of the conference between the stranger and the juror, yet he did not know and no one else knows what was said during the remainder of this confidential conference.

In my judgment, it can be no palliation of this potentially evil circumstance to argue that no harm resulted therefrom, predicating the argument on the claim that the

verdict of the jury was sustained by the evidence. An actual private confidential conversation between a juror and an unknown stranger must vitiate the verdict of conviction in a felony case and must not be permitted redemption by this dubious test. The factual contact, under the circumstances, must condemn the verdict; that alone is positive, visual, and actual, and physically demonstrated, and from it an evil motive and furtive method will be presumed as directed against the defendant. In other words, courts will presume that sinister words were spoken that influenced the verdict against the defendant under such conditions.

We are here dealing with permanent principles applicable generally to all such situations for the purpose of protecting all jury verdicts, and not merely an ephemeral expediency to save a particular verdict. It would be contrary to our jurisprudence to condone such conduct on the theory that no interest has been proven by the defendant to have been felt by the stranger in the result of this trial. In addition to what we have said supra, if sinister motives prompted this stranger to be a jury tamperer, he would have, more than likely, proceeded just as this man did, by camouflaging each step with an overt pretense of innocence, thus opening the door to fraud, collusion and corruption. The jury should be free even from suspicion, and its verdict above suspicion, like Caesar's wife. Confidence in the courts must be preserved, and solution of jury issues so safeguarded from similar incidents that verdicts will confidently be the product of law and evidence in the case, uninfluenced by extraneous direct personal pressure.

There is more at issue here than the correctness of a verdict, there is an assault upon the orderly process of judicature designed to insure equal opportunity to litigants before triers of fact, which, if it escapes condemnation, will open the doors to crafty or unscrupulous or audacious parties and enable them to reach privately

the ears of jurors. And, too, I think this matter cannot be relegated to the old familiar formula that every case must stand on its own peculiar facts and circumstances to determine the effect of this conversation. There must be one inviolable rule, sternly designed to protect the integrity of the verdict of juries. That rule can only be that when a juror in a felony panel, required to be kept together until verdict, has a private, confidential conversation with an outsider before verdict, no verdict of conviction can be permitted to stand, unless the State established competently by pertinent and sufficient evidence, that the defendant was not in fact prejudiced thereby.

In this connection, I quote from the pronouncement of this Court in Green v. State, 59 Miss. 501, in which Mr. Justice Cooper, speaking for the Court, said: ''It is not every act of misconduct on the part of jurors which will entitle a defendant to a new trial, but where such acts are shown, if they are of such a character as may have prejudiced the defendant, the presumption is that they did, and it devolves upon the State to establish the fact that such result did not follow. But where all of the facts and circumstances are known, and it appears with reasonable certainty, that though there was exposure to influences which might have perverted or corrupted the judgment of the juror, it was not done, then the verdict ought to stand.'' Let that test be applied here. The fact that part of this conversation ''may have prejudiced the defendant'' is not controverted by showing all of the facts and circumstances of the conversation, because no one knew them except the juror and the stranger, neither of whom testified. The presumption is, therefore, that the conference here did prejudice the defendant. The State did not establish by proof that such result did not follow. The verdict here, therefore, must be set aside unless the cited case be overruled, which I am unwilling to do.

Early decisions of this Court declared a rule governing the facts of the assignment of error here, which was very strict indeed, but it has been modified somewhat by later decisions until it has reached its present status. It will be of value, I think, to trace this development. This Court said in a very early case: "The Court said 'too much care and precaution cannot be used to preserve the purity of jury trials.' This strictness is necessary to give due confidence to the parties in the results of their causes; and everyone ought to know that for any, even for the slightest intermeddling with jurors, a verdict will always be set aside. In the case of Perkins v. Knight, 2 N. H. 474, the Court said that " 'it is of the highest importance that jurors should be preserved not only from all improper bias in causes, but even from the suspicion of improper bias.' " Hare v. State, 4 How. 187.

In Organ v. State, 26 Miss. 78, we held, in effect, that any separation of a juror from the presence of his fellows and the superintendence of the bailiff is prima facie evidence of irregularity, and the affidavit of such juror is not admissible to justify his conduct during separation. The Court said: "We think such a practice of the most evil tendency. If there have been corrupt communications between the juror and others they must from their nature be secret, and, in almost every case, impossible of proof by other testimony. Any juror who would be guilty of corruption, would not scruple to purge his conduct by the most comprehensive swearing." The verdict was set aside and the cause reversed and remanded for a new trial.

Ned v. State, 33 Miss. 364, reannounced the rule to the effect that if the verdict was rendered under circumstances in which its purity might have been affected, it must be set aside; if it could not have been affected it will be sustained. In Pope v. State, 36 Miss. 121, we held that when facts are established which show that the jury, on the trial of a felony, was exposed to improper

influences, which might have produced the verdict, the presumption of law is against the purity of the verdict; but it will not be set aside, if it appear by opposing evidence that such influence failed to have any effect on the jury. In the case cited, the "opposing evidence" detailed the conversation between a bailiff and the juror in detail, and none of it was withheld, while here only a few words of the conversation between the juror and the stranger were heard by anyone, the balance being inaudible to the bailiffs and the other jurors and the two or three others present in the courtroom. It will be noted also that in the cited case the court does not have recourse to the justice of the verdict as an expedient to sustain it, but speaks of "opposing evidence" to overcome the presumption. We have no such opposing evidence in the case at bar, although the State attempted it.

In Cartwright v. State, 71 Miss. 82, 14 So. 526, 527, one juror separated from the others and wrote a note to some one while so separated. This Court said: "How long this juror remained away from his fellows nowhere appears. To whom the note was written, or what were its contents, does not appear. . . . The state made no effort to show any fact by any witness which would relieve the conduct of the culpable juror of that suspicion which naturally attaches to it, and this, at least, the state was bound to do before its verdict would have been permitted to stand. . . . In all the multiplied cases in our own reports, from Hare's case, in 4 How. 187, to Skate's case, in 64 Miss. 644, 1 So. 843, [60 Am. Rep. 70], there is to be found universal and unmeasured condemnation of verdicts open to grave suspicion of unfairness." Here, in the case at bar, neither the juror nor the stranger was made a witness, and no one knew, except themselves, what they said to each other during the privacy of the last part of their conversation, audible to none but themselves.

Where, before the jury reported their verdict of guilty

in a capital case, it was learned from the bailiffs in charge of them that "another negro had just been killed in the town of Louisville," which remark was made by one bailiff to the other as they and the jury were going into the door of the jury room, the Court, speaking through Mr. Justice McGowen, said: ". . . this remark here cannot be distorted in anywise as relating to or referring to the defendant's case then on trial, and no reason can be deduced therefrom that it would be possible for any single juryman to have been influenced in his verdict in this case in the slightest degree." White v. State, 142 Miss. 484, 107 So. 755, 756. Ned & Taylor v. State, 33 Miss. 364, supra, was cited in this opinion of the Court.

A juror became separated from his fellows in the toilet, but overtook them later at the courthouse steps on the way to supper, and it was shown that in the meantime he had spoken only to the clerk of the court to ask where the jury had gone, the verdict was not vitiated and defendant was not entitled to a new trial. In that case, Judge Anderson, writing for the Court, said: "The evidence showed that during the separation of the jury, the juror, Wilson, was not tampered with by any one, and, in addition, that there was no opportunity for any improper influence to be brought to bear upon him. The possibility that a jury has been exposed to outside influences is not sufficient to vitiate their verdict." Sanders v. State, 150 Miss. 296, 116 So. 433, 434. The difference in that case and the one at bar must appear at once. Here, there was more than mere possibility, there was opportunity; there, everything that was said and done was clarified and exonerated by proof; here, such was not the fact.

This Court has also spoken more recently than the above decisions. In Queen v. State, 152 Miss. 723, 120 So. 838, 839, we again announced the rule. One of the jurors in that case retired from the company of his fellows at night, after they had entered on their delibera-

tions, and went into the office of the superintendent of education, where there was a telephone. The other jurors were all sleeping in the courtroom, where was operating an electric fan, under which the withdrawing juror could not sleep. The office was unoccupied, and when the bailiff went after the absent juror he was alone, and had seen no one and communicated with no one. Judge Ethridge for the Court wrote: "It is settled law in this state that the mere fact of separation alone is not sufficient to reverse, where there has been no opportunity for a juror to converse with other people, and where, in fact, no communication with any other person is shown. If the juror should separate and should come in contact with people in such way as to make it appear that he has had opportunity to communicate with others, then the verdict would be set aside." Here, the proof shows that the stranger actually had the opportunity in a private conversation, most of which was heard by none save the juror and the stranger. So, under the rule last above announced, and in harmony with the rule of law in this State, the verdict of the jury should have been set aside on the hearing of the motion for a new trial, and the motion sustained.

There is nothing in Turner v. State, 176 Miss. 862, 170 So. 642, 643 cited by the Attorney General in conflict with our conclusion here. In the Turner case, appellant filed a motion for a new trial on the ground that one of the jurors was permitted to separate from his fellows and was thereby afforded opportunity to communicate with outsiders. However, the evidence on the motion disclosed that the juror was at all times accompanied by a deputy sheriff, and had no communication whatsoever with outsiders. In other words, he really had no opportunity to communicate with outsiders, and did not do so. In the case at bar, the juror not only had the opportunity to have a private conversation away from his fellows, and out of the hearing of everyone else,

except for a word or two at its inception, but did, in fact, actually have a private conversation with a stranger under such circumstances. In the Turner case, we said: "The mere possibility that a juror has been exposed to outside influences is not sufficient to vitiate a verdict, and from the evidence in this case, it affirmatively appears that no improper influences were brought to bear on the juror. . . ." But in the case at bar, there was not only the possibility but the actual consummation of a private interview furnishing real opportunity for delivery of a message from another by the stranger to the juror, or transmission from the stranger himself to the juror of pressure to procure a verdict. Therefore, as stated, according to decisions of this Court in comparatively recent years, which have never been overruled, the presumption arose that improper influence was exerted on the juror. This presumption would, of course, have yielded to affirmative proof if offered by the State sufficiently to show the innocuousness of the whole conversation. However, the State failed to make such affirmative proof.

Therefore, I think that the judgment of the trial court should be reversed and the cause remanded for a new trial, when this unfortunate error will not recur. It cannot be said that the judge in passing on the proof on this motion should have his finding protected by the rule that it was not manifestly wrong, I think, because he had no evidence whatever as to what was said during most of this private conversation. It was then his duty to take that serious situation into sufficient recognition of the State's failure to overcome the presumption by affirmative evidence of enough probative value to rebut it. As stated, supra, the presumption still stood, and the motion should have been sustained.

Judge Alexander authorizes me to say that he joins in this dissent.